UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| RICHARD CURRAN, ET AL., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CV-06-104-B-W |
| | ) | |
| CAMDEN NATIONAL | ) | |
| CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

ORDER ON DEFENDANT'S MOTIONS TO DISMISS AND PLAINTIFFS' MOTION
TO AMEND THE AMENDED COMPLAINT

If Camden National Corporation (CNC) terminated its membership in the Bankers'

Health Trust (Trust) on June 30, 2006, it owes the Trust $525,000.00; if it terminates on June 30,

2007, it will owe almost nothing. The Trust prefers the larger number and has filed suit to get it.[1]

CNC responded with a motion to dismiss, claiming that the Trust's law suit runs afoul of the

remedy restrictions and preemption provisions of ERISA.

I.      **Factual Background**

   **A. The Bankers' Health Trust**

In 1994, the Maine Legislature passed the Maine Multi-Employer Welfare Arrangements

Act (the Act). *See* 24-A M.R.S.A. §§ 6601 et seq.[2] The Act, enacted in response to rising health

---

[1] The Plaintiffs are Richard Curran, Daniel R. Daigneault, Jane Madigan, Jon Prescott, Sandy Salisbury, and Marsha
Sawyer, trustees of the Bankers' Health Trust. *Am. Compl.* ¶ 4.

[2] The Act permits employers within a similar geographical area to create a so-called "multiple-employer welfare
arrangement," which is "an employer welfare benefit plan or any other arrangement that is established or maintained
for the purpose of offering or providing health benefits to the employees of 2 or more employers or to their
beneficiaries." 24-A M.R.S.A. § 6601(5). A participation agreement governs this arrangement and requires a
"declaration of trust," a "joint statement of those participating employers composing a multiple-employer welfare
arrangement in which the purposes, plan of administration, rights and duties of the participants and the manner of
funding obligations arising under the arrangement are established." 24-A M.R.S.A. § 6601(1).

care costs, allows employers to pool their resources to lower premiums. *Compl.* ¶ 1. In 2000, in an effort to reduce their health care costs, seven small regional banks[3] joined together to implement the provisions of the Act. *Compl.* ¶¶ 1, 8. They signed a Participation Agreement (Agreement) and Declaration of Trust (Declaration), both effective July 1, 2000. *Compl.* ¶ 1; *Agreement* ¶ 1; *Declaration*. The Declaration details a Participating Employer's obligations upon withdrawal from the Trust:

> Consistent with the Act, including any regulation of the Superintendent, and any rule or regulation adopted from time to time by the Board of Trustees, a Participating Employer may withdraw from the Trust effective only as of the last day of any Plan Year, upon (i) at least ninety (90) days prior written notice to the Trustees and (ii) the payment of an additional three (3) months of premiums at the rate in effect as of the date of such termination.

*Declaration* Art. 4, ¶ 4.5.

### B. The CNC Gives Notice of Withdrawal and the Trust Sends the Bills

On February 14, 2006, CNC wrote the Trust:

> Please accept this letter as notification from Camden National Corporation of its intent to terminate participation in the Trust, as required in Article 4, paragraph 4.5 of the Bankers' Health Trust, Declaration of Trust Agreement ("Agreement"). We intend to notify you as to the effective date of our withdrawal by March 31, 2006.

*Compl.* Ex. C. On March 13, 2006, CNC met with Mark Walker – Managing Administrator of the Trust – and Dan Daigneault – the chairman of the Trust's board of trustees. *Am. Compl.* ¶ 42. Plaintiffs allege that CNC "proposed that it be allowed to withdraw from the Trust on June 30, 2006 and pay only its exact claims amount incurred prior to that date, rather than the three months' premium required by the Declaration of Trust and the Participation Agreement." *Id.* ¶

---

[3] The seven Participating Employers were Bar Harbor Banking & Trust, First National Bank of Damariscotta, Maine Bank & Trust, Pepperell Bank & Trust, Camden National Corporation, Ocean National Bank, and Union Trust Company. *Declaration* at 17. June B. Parent of Camden National Corporation was one of the original Bankers' Health Trust Trustees. *Declaration* at 16.

43.  On March 14, 2006, the Trust's board of trustees rejected CNC's withdrawal proposal.  *Am. Compl.* ¶¶ 43-44.  In a letter dated March 23, 2006, Mark Walker explained:

> As an ERISA plan, each Trustee holds a fiduciary duty for every employee receiving medical coverage from the Plan.  Without doubt, Camden's decision to withdraw creates additional risk for the remaining employees, and authorizing either of Camden's requests adds to this risk.  One of the primary benefits of a group plan is the increased stability from having larger numbers of enrolled participants.  Camden's exit from the plan makes the Trust riskier for the remaining participants, and there is potential "harm" for the remaining participants should the Trustees approve either of the two requests.

*Compl.* Ex. D.

CNC replied by letter dated March 31, 2006 and frankly disclosed its plan for withdrawal:

> Effective June 30, 2006 CNC will offer a large group of our employees a fully funded health insurance plan that will better meet their needs and cost demands.  A smaller group of employees will continue their health insurance benefits through the Trust until June 30, 2007.  Continuing CNC's membership as a participating employer in the Trust will decrease the three-month premium penalty assessed upon termination and will protect our interests in the cash fund reserve, which we firmly believe is based on actual paid-in value by the participating employer and employees.

*Compl.* Ex. D.  According to CNC, its withdrawal would become effective June 30, 2007, not 2006.[4]  In the interim, CNC's enrollment would decrease from 260 participants to just five, thereby dramatically reducing the "rate in effect as of the date of such termination" under paragraph 4.5 of the Declaration, and, accordingly, the termination amount CNC owed the Trust. *Am. Compl.* ¶ 50.

---

[4] This course of action was also utilized by a previous withdrawing participant, Pepperell Bank & Trust.  *Compl.* ¶ 33.  The Complaint alleges that CNC's trustee – June Parent – gained knowledge of Pepperell's means of withdrawing from the trust.  *Id.*  However, the Complaint does not explicitly allege that Ms. Parent conveyed this information to CNC, or that doing so would have been improper.

Notwithstanding CNC's letter, the Trust treated CNC's February 14, 2006 notice as establishing the effective date of withdrawal, June 30, 2006, and the Trust issued CNC invoices for the three-month "runoff period" in the amount of $175,200 per month. *See* Ex. E, F. After CNC failed to pay, the Trust brought suit.[5]

## II.    Procedural History

In their Amended Complaint, Plaintiffs allege federal jurisdiction under ERISA and assert several state law claims. *See Am. Compl.* (Docket # 10). The Amended Complaint contains six counts: (1) breach of contract - Declaration; (2) breach of contract - Agreement; (3) breach of the implied covenant of good faith and fair dealing; (4) breach of fiduciary duty in violation of ERISA, 29 U.S.C. § 1109; (5) civil enforcement of Declaration and Agreement, 29 U.S.C. § 1132; and, (6) declaratory judgment. On November 20, 2006, Plaintiffs moved to amend the Amended Complaint, attaching a proposed Second Amended Complaint. *See Pls.' Mot. for Leave to Amend the Compl.* (Docket # 19). This pleading would add a new paragraph 86 under Count V:

> The Trust therefore seeks equitable relief to redress Camden National's violations of the terms of the Declaration of Trust and the Participation Agreement, and to enforce the terms of these agreements, including payment of the $525,600 owed to the Trust and in Camden National's possession, and payment of all claims incurred by Camden National participating employees prior to June 30, 2006.

---

[5] There was evidence at the oral argument that in July 2006, the Plaintiffs terminated CNC as a Participating Employer. This is not, however, alleged in the Amended Complaint and, to the extent the Court can consider the July 6, 2006 letter from Attorney Biagetti to Attorney Montgomery in ruling on the Rule 12(b)(6) motion, its contents are too ambiguous to draw any sustainable conclusions. *Def.'s* Hearing Ex. 1.

*Pls.' Mot.* Ex. A.  It also adds five paragraphs to the Request for Relief, delineating the equitable

relief the Trust seeks.[6]  CNC opposes the Trust's motion for leave to amend.  *See Def.'s Obj. to*

*Pls.' Mot. to Amend First Am. Compl.* (Docket # 21).

## III.   Motion to Dismiss

Rule 12(b)(6) provides, in part:

> Every defense, in law or fact, to a claim for relief in any
> pleading . . . shall be asserted in the responsive pleading thereto if
> one is required, except that the following defenses may at the
> option of the pleader be made by motion: . . . (6) failure to state a
> claim upon which relief can be granted . . . .

Fed. R. Civ. P. 12(b)(6).  "In ruling on a motion to dismiss [under Rule 12(b)(6)], a court must

accept as true all the factual allegations in the complaint and construe all reasonable inferences in

favor of the plaintiffs."  *Alternative Energy, Inc. v. St. Paul Fire & Marine Ins. Co.*, 267 F.3d 30,

33 (1st Cir. 2001) (citing *Beddall v. State St. Bank & Trust Co.*, 137 F.3d 12, 16 (1st Cir. 1998)).

A defendant is entitled to dismissal only if it "'appears to a certainty that the plaintiff would be

unable to recover under any set of facts.'"  *State St. Bank & Trust Co. v. Denman Tire Corp.*, 240

---

[6] The Plaintiffs request:

> 6.    equitable relief in the form of an order requiring Camden National to
>       pay to the Trust the $525,600 in premium which Camden National
>       expressly pledged to pay through an equitable assessment upon
>       termination of participation in the Trust;
>
> 7.    equitable relief in the form of an order requiring Camden National to
>       reimburse the Trust for all actual claims presented by Camden National
>       participating employees prior to June 30, 2006;
>
> 8.    equitable relief in the form of an order to enforce and require Camden
>       National to comply with Article 4, paragraph 4.5(a) of the Declaration
>       of Trust;
>
> 9.    equitable relief in the form of an order to enforce and require Camden
>       National to comply with Article 4, paragraph 4.5(c) of the Declaration
>       of Trust;
>
> 10.   equitable relief in the form of an order to enforce and require Camden
>       National to comply with paragraph 4 of the Participation Agreement . .
>       . .

*Mot. for Leave to Amend* Ex. A at 20-21

F.3d 83, 87 (1st Cir. 2001) (quoting *Roma Constr. Co. v. A Russo*, 96 F.3d 566, 569 (1st Cir. 1996)); *see also Nethersole v. Bulger*, 287 F.3d 15, 18 (1st Cir. 2002).

Ordinarily, when a court reviews a motion to dismiss, it may not take into account documents outside the complaint. *Alternative Energy*, 267 F.3d at 33. An exception exists, however, for "documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint."[7] *Id.*; *Beddall v. State St. Bank & Trust Co.*, 137 F.3d 12, 16 (1st Cir. 1998). Here, Plaintiffs attached a number of documents to the Complaint, "the authenticity of which are not disputed by the parties" and which are "central to the plaintiffs' claim." *See id*. CNC has not disputed the authenticity of the documents, and has referred to them throughout its filings. In accordance with the *Alternative Energy* exception, the Court has considered the documents attached to the Complaint in ruling on the motion to dismiss. Finally, at oral argument, CNC introduced a copy of a letter dated July 6, 2006 from Attorney Biagetti, the Trust's lawyer, to Attorney Montgomery, CNC's lawyer, and the parties agreed that the Court could consider the letter in ruling on the motion to dismiss. *Def.* Hearing Ex. 1.

## IV.   Discussion

### A.      ERISA Civil Enforcement - 29 U.S.C. § 1132

In Count V of the Amended Complaint, Plaintiffs seek an equitable remedy to enforce the terms of the Plan documents under ERISA. *See Am. Compl*. ¶¶ 80-85. In particular, Plaintiffs allege that CNC has "refused to pay the three months' additional premium," *Am. Compl*. ¶ 83, and "has refused to pay the amounts necessary to pay all [CNC] claims" incurred prior to withdrawal. *Id*. ¶ 84. Plaintiffs assert: "The Trust's claim under this ERISA provision seeks

---

[7] The attached documents are:  (1) the Declaration; (2) the Agreement; (3) the February 14, 2006 letter from CNC to the Trust; (4) the March 31, 2006 letter from CNC to the Trust; and (5) two invoices – July and August 2006 – from the Trust to CNC.

redress in equity for Camden National's violations of the Declaration of Trust and the

Participation Agreement. . . .  Specifically, the Trust seeks to enforce the terms of these ERISA

plan documents." *Pls.' Opp'n to Def.'s Mot. to Dismiss Am. Compl.* at 3 (Docket # 18) (*Pls.'*

*Second Opp'n*).  Plaintiffs seek relief in Count V under 29 U.S.C. § 1132(a)(3), which provides:

> A civil action may be brought by a participant, beneficiary, or
> fiduciary (A) to *enjoin* any act or practice which violates any
> provision of this subchapter or the terms of the plan, or (B) to
> obtain other appropriate *equitable relief* (i) to redress such
> violations or (ii) to enforce any provisions of this subchapter or the
> terms of the plan.

*Id*. (emphasis added).   By its terms, however, section 1132(a)(3) authorizes only "those

categories of relief that were *typically* available in equity." *Sereboff v. Mid Atl. Med. Servs.*,

__U.S.__, 126 S. Ct. 1869 (2006) (quoting *Mertens v. Hewitt Associates*, 508 U.S. 248, 256

(1993) (emphasis in original)).  If the plaintiffs seek legal as opposed to equitable relief, "their

suit is not authorized by § [1132(a)(3)]." *Great-West Life & Annuity Ins. Co. v. Knudson*, 534

U.S. 204, 218 (2002).

The First Circuit has set forth a two-step inquiry to evaluate a cause of action under §

1132(a)(3):  "1) is the proposed relief equitable, and 2) if so, is it appropriate?" *LaRocca v.*

*Borden, Inc.*, 276 F.3d 22, 27-28 (1st Cir. 2002).  With respect to the first prong, under ERISA,

"'equitable relief' includes 'those categories of relief that were typically available in equity (such

as injunction, mandamus, and restitution, but not compensatory damages).'" *Id*. at 28 (quoting

*Mertens*, 508 U.S. at 256).  Turning to the second step, the purpose of § 1132(a)(3) is to serve as

a "safety net, offering appropriate equitable relief for injuries caused by violations that § [1132]

does not elsewhere adequately remedy." *Id*. (quoting *Varity Corp. v. Howe*, 516 U.S. 489, 512

(1996)).

CNC claims that Count V does not make it past the first inquiry; that is, that Plaintiffs are seeking a legal remedy in equity's clothing, a cause of action "not authorized by § 1132(a)(3)." *Knudson*, 534 U.S. at 218. There is merit to this argument. In *Knudson*, the plaintiff insurance companies sued beneficiaries for reimbursement of monies that the beneficiaries had recovered pursuant to a settlement – essentially to prevent double recovery.[8] The Supreme Court held that the insurers' claim under § 1132(a)(3) did not seek equitable relief because it was, in reality, a claim for money damages. The Court noted:

> Here, petitioners seek, in essence, to impose personal liability on respondents for a contractual obligation to pay money – relief that was not typically available in equity. A claim for money due and owing under a contract is quintessentially an action at law. Almost invariably . . . suits seeking (whether by judgment, injunction, or declaration) to compel the defendant to pay a sum of money to the plaintiff are suits for money damages, as that phrase has traditionally been applied, since they seek no more than compensation for loss resulting from the defendant's breach of legal duty. And money damages are, of course, the classic form of *legal* relief.

*Id*. at 210 (citations and internal punctuation omitted) (emphasis in original). The Court further noted that "an injunction to compel the payment of money past due under a contract, or specific performance of a past due monetary obligation, was not typically available in equity." *Id*. at 210-11. Therefore, it is not available under § 1132 either. Here, Plaintiffs seek the same sort of remedy as the insurers in *Knudson*. They propose to use § 1132 to enforce CNC's contractual obligations under the Declaration of Trust and the Participation Agreement by requiring CNC to pay three months of premiums and accrued claims. As in *Knudson*, Plaintiffs' claim for a legal remedy is not available to them under § 1132(a)(3).

---

[8] However, the beneficiaries did not have possession of the funds; rather, they were placed in a "special needs trust." *Knudson*, 534 U.S. at 207-08.

To support their § 1132(a)(3) cause of action, Plaintiffs raise *Sereboff*. They argue that *Sereboff* "squarely addressed *and expanded* the scope of relief available as 'other appropriate equitable relief' under 29 U.S.C. § 1132(a)(3)." *Pls.' Second Opp'n* at 3 (emphasis in original). In *Sereboff*, after the plan beneficiaries were injured in a car accident, the plan paid their medical expenses, totaling $74,869.37. 126 S. Ct. at 1872-73. The Sereboffs filed a tort action against several third parties. Under the terms of the plan, the beneficiaries were required to reimburse the plan for "[a]ll recoveries from a third party . . . ," *id.*, and in accordance with that provision, the plan placed the Sereboffs on notice that it was claiming a lien against the anticipated proceeds of the law suit. Following a settlement of $750,000, however, neither the Sereboffs nor their attorneys sent any money to the plan. *Id*. at 1873. After the plan filed suit, the parties agreed to set aside the full $74,869.37 in an investment account until the law suit was resolved. *Id.*

Claiming entitlement to $74,869.37 of the settlement proceeds, the plan sued under 29 U.S.C. § 1132(a)(3), seeking an equitable lien on the money in the Sereboffs' possession.[9] *Id*. The *Sereboff* Court discussed whether the asserted lien was "for 'restitution' and thus equitable under [§ 1132(a)(3)(B)]." *Id.* at 1874. The Court noted that "one feature of equitable restitution was that it sought to impose a constructive trust or equitable lien on particular funds or property in the defendant's possession." *Id.* (internal punctuation and citation omitted). Concluding that the requested relief in *Sereboff* was equitable and recoverable under § 1132(a)(3), the Court

---

[9] In *Knudson*, the issue of an equitable lien did not come up because the plaintiffs did not seek that remedy. The Court explained:

> The basis for petitioners' claim is not that respondents hold particular funds that, in good conscience, belong to petitioners, but that petitioners are contractually entitled to *some* funds for benefits that they conferred. The kind of restitution that petitioners seek, therefore, is not equitable – the imposition of a constructive trust or equitable lien on particular property – but legal – the imposition of personal liability for the benefits that they conferred upon respondents.

*Id.* at 214.

noted that the plan "sought specifically identifiable funds that were within the possession and control of the Sereboffs – that portion of the tort settlement due Mid Atlantic under the terms of the ERISA plan, set aside and preserved [in the Sereboffs'] investment accounts." *Id*. at 1874. Important to the Court's reasoning was that the insurer "sought its recovery through a constructive trust or equitable lien on a specifically identified fund, not from the Sereboffs' assets generally, as would be the case with a contract action at law." *Id*.

Although the First Circuit has not applied *Sereboff*,[10] other courts have. In *Popowski v. Parrott*, 461 F.3d 1367 (11th Cir. 2006), the Eleventh Circuit considered a consolidated case, which highlights the *Sereboff* distinction. *Popowski* involved two similar, but distinct claims. In the first, the claimant was injured in an accident and sustained $152,889.65 in medical expenses, which the plan paid. *Id*. at 1370. The claimant subsequently obtained a settlement of $525,000. Under the employee health benefit plan, "the Covered Person . . . must repay to the Plan the benefits paid on his or her behalf out of the recovery made from the third party or insurer." *Id*. The plan was unsuccessful in collecting reimbursement payment from the claimant, and sued. The district court dismissed the action, holding that it lacked subject matter jurisdiction because the plan was seeking legal, not equitable relief.

In the second claim, the beneficiaries were also involved in an accident and the plan extended benefits of $122,393.64 and $3,971.09 to each beneficiary, respectively. The beneficiaries received settlements from the tortfeasor's insurer and the plan demanded reimbursement under the subrogation – reimbursement provision of the plan. The plan called for reimbursement "in full, and in first priority, for any medical expenses paid by the Plan relating to

---

[10] In *Green v. ExxonMobil Corp.*, the First Circuit cited *Sereboff* for the proposition that what forms of relief are considered "equitable" is a matter "in dispute."   470 F.3d 415, 421 n.7 (1st Cir. 2006).

the injury . . . ." *Id.* at 1371.  The district court also dismissed this claim for the same reasons it dismissed the first claim.

Applying *Sereboff*, the Eleventh Circuit reversed the first decision, but affirmed the second.  They reasoned that, in the first claim, "the plan language . . . specifies both the fund (recovery from the third party or insurer) out of which reimbursement is due to the plan and the portion due the plan (benefits paid by the plan on behalf of the defendant)."  *Id*. at 1373.  Thus, the insurer did not seek to impose personal liability on the claimant, and the equitable lien theory prevailed.  In contrast, the court of appeals did not find an equitable lien in the second claim, noting that under that plan the reimbursement language only "claims a right to reimbursement 'in full, and in first priority, for any medical expenses paid by the Plan relating to the injury or illness,' but does not specify that that reimbursement be made out of any particular fund, as distinct from the beneficiary's general assets."  *Id*. at 1374.

Here, even though Plaintiffs seek to recover a particular sum of money – $525,000, they seek the money from CNC's general, commingled assets, not from "particular funds or property in the defendant's possession." *Sereboff*, 126 S. Ct. at 1874.  Consistent with *Sereboff*, it follows that the Plaintiffs are not asserting an equitable lien or claiming the equitable remedy of restitution.

The Plaintiffs make a brave attempt to infer an "equitable lien by agreement" from language in the Participation Agreement:  "This is a fully assessable contract.  In the event the Trust is unable to pay its obligations, Participating Employers will be required to contribute through an *equitable assessment* the money necessary to meet any unfulfilled obligations." Participation Agreement ¶ 4 (emphasis added).  Plaintiffs claim that "[b]y this provision, each of the participating employers, including Camden National, pledged in equity to uphold their

obligations under the plan terms, including the obligation to pay three months premium upon termination." *Pls.' Second Opp'n* at 9.

The Court does not agree with the Plaintiffs' expansive reading of paragraph 4. This provision describes what would happen if the Trust were unable to pay its debts: each participant would be required to pay its equitable share. The Amended Complaint does not allege that that the Trust has been or currently is "unable to pay its obligations" and the Plaintiffs have not alleged that they have invoked this clause. As CNC points out, the mere presence of the word "equitable" does not create an equitable lien.

At oral argument, the Plaintiffs earnestly asserted that, at the Trust's inception, all Participating Employers understood that they would be required to fund the Trust with sufficient money to maintain its actuarial integrity. The Plaintiffs claim that as part of this agreement the Participating Employers had a common understanding that, as part of their mutual obligations as Participating Employers to each other and to their respective employees, they were to set aside funds sufficient to pay the three-month runoff period in the event of withdrawal. Citing Justice Holmes in *Barnes v. Alexander*, 232 U.S. 117 (1914), the Plaintiffs maintain that there is no "tracing requirement" for the assertion of an equitable interest.

The Court does not view *Barnes* as dispositive. In *Barnes*, the lawyers in one firm performed work for Attorney Barnes on the promise that they would receive one-third of the contingent fee. *Id.* at 119. When the money came in, however, Mr. Barnes failed to pay and the other attorneys sued. Resolving the case against Mr. Barnes, Justice Holmes recited the "familiar rule[] of equity that a contract to convey a specific object even before it is acquired will make the contractor a trustee as soon as he gets a title to the thing." *Id.* at 121. On the basis of this rule, Mr. Barnes's agreement "create[d] a lien" upon the portion of the monetary recovery

due Barnes from the client which the other attorneys could "follow . . . into the hands of . . . Barnes," "as soon as [the fund] was identified." *Id.* at 123. Here, CNC neither possessed nor came into a fund that the Plaintiffs can rightfully claim is identified to pay the three month premium assessment upon withdrawal. *Barnes* is unavailing.

Furthermore, to accept the Plaintiffs' proposition would create an equitable lien virtually wherever there is a contractual dispute among joint venturers, since the parties can nearly always assert that they had agreed to maintain the financial integrity of the venture. When applied to ERISA-related joint ventures, the result would counteract the thrust of ERISA pre-emption and, contrary to congressional motivation in enacting ERISA, controversies among ERISA participants would be controlled and differentially resolved by a multiplicity of state laws.

Here, it is undisputed that there are no specific, identifiable funds that CNC set aside for the purpose of paying the three-month withdrawal penalty. The Plaintiffs are simply seeking payment from the commingled assets in CNC's general coffers. The Court concludes under *Knudson* and *Sereboff* that the Plaintiffs have not stated a claim for equitable relief under 29 U.S.C. § 1132(a)(3).

## B.     Breach of Contract – Counts I and II

Plaintiffs also assert several state law causes of action, including two counts of breach of contract, and in response, CNC raises ERISA preemption. ERISA contains a preemption clause, which provides:

> Except as provided in subsection (b) of this section, the provisions of this title and title IV shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 4(a) [29 U.S.C. § 1003(a)] and not exempt under section 4(b) [29 U.S.C. § 1003(b)].

29 U.S.C. § 1144(a).[11]   ERISA also contains a description of Congress's purpose in enacting the legislation:  to "establish[] standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and [] provid[e] for appropriate remedies, sanctions, and ready access to the Federal courts."  29 U.S.C. § 1001(b).  Consistent with these provisions, the Supreme Court has written that "ERISA includes expansive pre-emption provisions . . . which are intended to ensure that employee benefit plan regulation would be 'exclusively a federal concern.'"  *Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004).  "The purpose of ERISA is to provide a uniform regulatory regime over employee benefit plans."  *Id.* at 208; *see also Boston Children's Heart Found. v. Nadal-Ginard*, 73 F.3d 429, 439 (1st Cir. 1996) ("Congress included § 514(a) [preemption provision] to ensure uniformity in such plans by preventing states from imposing divergent obligations upon them.").

ERISA also defines what section 1144(b) means by the term "state law":  "all laws, decisions, rules, regulations, or other State action having the effect of law, of any State."  29 U.S.C. § 1144(c).  This definition includes state common law causes of action to enforce rights under an ERISA plan.  *See Aetna Health*, 542 U.S. at 209; *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 52-57 (1987); *see also Turner v. Fallon Community Health Plan*, 127 F.3d 196, 199 (1st Cir. 1997) ("It would be difficult to think of a state law that 'relates' more closely to an employee benefit plan than one that affords remedies for the breach of obligations under that plan.").  Further, a "state-law cause of action that duplicates, supplements, or supplants the ERISA civil enforcement remedy conflicts with the clear congressional intent to make the

---

[11] The First Circuit begins its analysis of express ERISA preemption with two central questions: "(1) whether the plan at issue is an employee benefit plan and (2) whether the cause of action relates to this employee benefit plan." *Hampers v. W.R. Grace & Co.*, 202 F.3d 44, 49 (1st Cir. 2000) (quoting *McMahon v. Digital Equip. Corp.*, 162 F.3d 28, 36 (1st Cir. 1998) (internal quotation marks omitted)).  Here, the Bankers' Health Trust fits squarely within the statutory definition of "employee benefit plan," 29 U.S.C. § 1002(1); the sole remaining question is whether the state causes of action relate to the employee benefit plan.

ERISA remedy exclusive and is therefore pre-empted."  *Aetna Health*, 542 U.S. at 209; *see also Carpenters Local Union No. 26 v. United States Fid. & Guar. Co.*, 215 F.3d 136, 140 (1st Cir. 2000) ("It is well accepted . . . that state laws which furnish alternative enforcement mechanisms threaten the uniformity that Congress labored to achieve and thus are preempted by ERISA."). "Thus, when state-law claims 'relate to' ERISA plans, those claims are transmuted into ERISA claims." *Carpenters Local Union No. 26,* 215 F.3d at 139.[12]  Nevertheless, ERISA's preemptive power is not absolute:  "If 'relate to' were taken to extend to the furthest stretch of its indeterminacy, then for all practical purposes pre-emption would never run its course . . . ."  *New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995).

### 1.  The "Relate To" Factor

In *Ingersoll-Rand Co. v. McClendon*, the Supreme Court "identified two instances where a state cause of action relates to an employee benefit plan:  where the cause of action requires 'the court's inquiry [to] be directed to the plan,' or where it conflicts directly with ERISA." *Carrasquillo v. Pharmacia Corp.*, 466 F.3d 13, 20 (1st Cir. 2006) (quoting *Ingersoll-Rand*, 498 U.S. 133, 140-42 (1990)).  The First Circuit has described the question as whether "a state law 'relates to' an ERISA plan or is merely 'tenuous, remote, or peripheral.'"  *Boston Children's Heart Found.,* 73 F.3d at 440.  Addressing state law causes of action, the First Circuit has ruled that "a cause of action 'relates to' an ERISA plan when a court must evaluate or interpret the

---

[12] In *Carpenters Local Union*, the First Circuit decided the state law claims were not preempted, because the state law at issue – a Massachusetts bond statute – had no "proscribed alternative enforcement mechanism," and no "meaningful nexus with ERISA."  215 F.3d at 141.

terms of the ERISA-regulated plan to determine liability under the state law cause of action." *Hampers*, 202 F.3d at 52;[13] *see also Carrasquillo*, 466 F.3d at 20.

Plaintiffs argue that the breach of contract claim "is not sufficiently related to ERISA to warrant preemption." *Pls.' Opp'n to Def.'s Mot. to Dismiss* at 8 (Docket # 13) (*Pls.' First Opp'n*). They assert that a breach of contract claim is a law of general applicability, such that it is "tenuous, remote, or peripheral" to the Trust plan. While conceding that "the inquiry does require a reading of the Declaration of Trust and Participation Agreements," they contend that "the fact that these documents are ERISA plan documents is not material to the determination of the obligations of Camden National to pay pursuant to the terms of the agreements it executed." *Pls.' First Opp'n* at 11.

To determine whether CNC breached the contract, however, as the Plaintiffs concede, the Court must interpret the Declaration's withdrawal procedure and thus, "to evaluate or interpret the terms of the ERISA-regulated plan to determine liability under the state law cause of action." *Hampers*, 202 F.3d at 52; *see also Perrotti v. Wal-Mart Stores Inc.*, No. 05-cv-243-PB, 2006 U.S. Dist. LEXIS 1939, at *8-9 (D.N.H. Jan. 19, 2006). The breach of contract cause of action "requires the court's inquiry to be directed to the plan." *Carrasquillo*, 466 F.3d at 20.

### 2. The ERISA Savings Clause

Relying on the insurance savings clause, Plaintiffs' second argument is one of necessity: they claim the need to enforce the insurance provisions of the Maine Act under ERISA because the Maine Act provides no enforcement mechanism *Pls.' First Opp'n* at 8. ERISA provides that "nothing in this title shall be construed to exempt or relieve any person from any law of any

---

[13] In *Hampers*, the First Circuit affirmed a district court's holding that ERISA preempted the plaintiff's state law breach of contract claim. In that case, the plaintiff – whose company had been bought out by defendant – had negotiated with the defendant to enroll in defendant's retirement plan and supplemental executive retirement plan. Plaintiff filed suit, alleging that he had been wrongly denied participation in another supplemental executive retirement plan.

State which regulates insurance, banking, or securities." 29 U.S.C. § 1144(b)(2)(A). This clause is known as a "savings clause," because if the law "regulates insurance," it is thereby "saved from pre-emption." *Kentucky Ass'n of Health Plans, Inc. v. Miller*, 538 U.S. 329, 333 (2003). The Plaintiffs assert that, pursuant to this clause, the Maine Act is not preempted because it regulates insurance and, in the absence of an enforcement provision in the Maine Act, the only way to enforce the Maine statute is through a state law breach of contract action.

In *Kentucky Ass'n*, the United States Supreme Court established a "revised analysis for the ERISA's savings clause." *Desrosiers v. Hartford Life & Accident Ins. Co.*, 354 F. Supp. 2d 119, 127 (D.R.I. 2005). Making a "clean break from the McCarran-Ferguson factors," the Court held that "for a state law to be deemed a 'law . . . which regulates insurance' under § 1144(b)(2)(A), it must satisfy two requirements. First, the state law must be specifically directed toward entities engaged in insurance. Second, . . . the state law must substantially affect the risk pooling arrangement between the insurer and the insured." *Kentucky Ass'n of Health Plans*, 538 U.S. at 341-42 (citations omitted).

Applying these criteria to this case, the savings clause fails to save. The Plaintiffs' causes of action remain state contract actions, not causes of action under the Act, since the Act does not – as Plaintiffs acknowledge – authorize their cause of action. Simply because the Act sanctions the Trust does not mean that breach of contract actions among its Participating Employers "substantially affect the risk pooling arrangement between the insurer and the insured." *Id.* To rule otherwise would be to create an enormous statutory exception to ERISA, since any breach of contract claim that references a state enabling insurance statute would be exempt from ERISA preemption and would negate the underlying purpose of ERISA: "to

provide a uniform regulatory regime over employee benefit plans." *Aetna Health*, 542 U.S. at 208.

Following the weight of authority from both the Supreme Court and the First Circuit, Plaintiffs' state law breach of contract claims are ERISA-preempted.

### C.    Breach of Implied Covenant of Good Faith and Fair Dealing – Count III

In Count III, Plaintiffs allege another state law claim:  breach of the implied covenant of good faith and fair dealing.  As a state law claim, Count III could also fall victim to ERISA's broad preemption power if the Court must "evaluate or interpret the terms of the ERISA-regulated plan to determine liability under the state law cause of action." *Hampers*, 202 F.3d at 52.  The language of Count III itself calls attention to the terms of the Declaration of Trust and Participation Agreement: "The actions of Camden National, including but not limited to its attempt to withdraw from the Trust without paying the three months' premium for 260 of its employee participants, *as required under the terms of the Declaration of Trust and the Participation Agreement*, constitute a violation of these duties." *Am. Compl.* ¶ 71.  Count III also states: "Each of the Plan Participants is bound by ERISA to abide by the terms of the Declaration of Trust and Participation Agreements." *Id.* ¶ 70.  To rule, the Court must consider the reimbursement provision of the Declaration of Trust, which is an ERISA plan document. Therefore, as with the breach of contract claims, Count III is preempted by ERISA.

Notwithstanding the preemption issue, CNC moved to dismiss this Count based on its assertion that, except for certain insurance contracts and contracts arising under the Uniform Commercial Code, Maine law does not recognize a cause of action for breach of an implied duty of good faith and fair dealing.  Maine case law supports CNC's position.  *See, e.g.*, *Haines v. Great Northern Paper, Inc.*, 2002 ME 157, ¶ 15, 808 A.2d 1246, 1250 ("We have declined to

impose a duty of good faith and fair dealing except in circumstances governed by specific provisions of the Uniform Commercial Code."); *First NH Banks Granite State v. Scarborough*, 615 A.2d 248, 251 (Me. 1992); *Maine Farms Venison, Inc. v. Peerless Ins. Co.*, 2004 ME 80, ¶ 17, 853 A.2d 767, 769 ("We have held that 'in every insurance contract an insurer owes a duty to act in good faith and deal fairly with its insured' in the handling of insurance claims.") (quoting *Marquis v. Farm Family Mut. Ins. Co.*, 628 A.2d 644, 648 (Me. 1993)); *see also Wortley v. Camplin*, 333 F.3d 284, 293 (1st Cir. 2003); *Seabury Housing Associates v. Home Ins. Co.*, 695 F. Supp. 1244, 1249 (D. Me. 1988). *Haines* also noted that such a duty "derives from the insurer's relationship as 'the authorized representative of the insured.'" *Id.* (quoting *Linscott v. State Farm Mut. Auto Ins. Co.*, 368 A.2d 1161, 1163 (Me. 1977)).[14]

Plaintiffs argue that this case must be placed in the context of an insurance contract, thereby imposing an implied duty of good faith and fair dealing: "Camden National's position as a Participating Employer, obligated to act for the benefit of the plan participants, is comparable to that of an insurer who is contractually bound to represent the interests of its insured." *Pls.' First Opp'n* at 19. However, as CNC points out, the Maine cases that Plaintiffs cite involve dissimilar factual situations. *See Maine Farms Venison, Inc.*, 2004 ME 80, ¶ 17, 853 A.2d at 770; *Marquis*, 628 A.2d at 648. The relationship between CNC and the Plaintiffs is not the same

---

[14] Even if CNC had a duty to act in good faith and deal fairly with the Trust, this would not provide the basis for a separate cause of action. Here, the Plaintiffs have alleged under Count I that CNC breached its contract and under Count III that CNC breached the implied covenant of good faith and fair dealing. The duty to act in good faith and deal fairly, if it applied, would provide parameters for measuring whether CNC breached its duties under the contract, but would not provide an independent cause of action. Count III does not state a claim in any event. In *Maine Farms Venison*, for example, the plaintiff sued the insurer for breach of contract and for unfair claims practices, but did not assert a separate count for breach of an implied duty of good faith and fair dealing. 2002 ME 80, ¶ 8, 853 A.2d at 768. The same is true in *Marquis*. Although the plaintiffs began with a count for breach of fiduciary duty and commission of the tort of bad faith, the trial court dismissed that count and the case went to the jury only on the breach of contract count. There was no separate count for a contractual breach of the implied duty to act in good faith and deal fairly. *Marquis* refused "to adopt an independent tort action for an insurer's breach of the implied contractual obligation to act in good faith and deal fairly with an insured . . . ." *Marquis*, 628 A.2d at 652.

19

as the insurer/insured relationship; to characterize it as such stretches the bounds of Maine case law.

### D.     ERISA - Breach of Fiduciary Duty

In Count IV of their Amended Complaint, Plaintiffs allege a breach of fiduciary duty under ERISA.  *See Compl*. ¶¶ 75-79.  The statutory basis for this count is 29 U.S.C. § 1109, which provides:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary. A fiduciary may also be removed for a violation of section 411 of this Act [29 U.S.C. § 1111].

*Id*.

To begin, Plaintiffs assert that CNC was a fiduciary of the trust because it "controlled and managed the operation and administration of the Trust through its executive officers' participation as a Trustee of the Trust."  *Am. Compl.* ¶ 76.  The first issue, then, is whether CNC is a fiduciary under ERISA's definition of that term.   The relevant definitional provision is 29 U.S.C. 1002(21)(A):

> Except as otherwise provided in subparagraph (B), a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A).  In *Varity Corp. v. Howe*, the Supreme Court explained congressional

intent:

> In recognition that ERISA allows trustee-beneficiary arrangements that the common law of trusts generally forbids, Congress "defined 'fiduciary' not in terms of formal trusteeship, but in functional terms of control and authority over the plan." *Mertens*, 508 U.S. at 262 (emphasis in original). Accordingly, under ERISA, a person "is a fiduciary with respect to a plan" only "to the extent" that "he has any discretionary authority or discretionary responsibility in the administration of such plan." § 3(21)(A)(iii), 29 U.S.C. § 1002(21)(A)(iii) (1988 ed.).    This "artificial definition of 'fiduciary,'" *Mertens*, supra, at 255, n. 5, is designed, in part, so that an employer that administers its own plan is not a fiduciary to the plan for all purposes and at all times, but only to the extent that it has discretionary authority to administer the plan. When the employer is not acting as plan administrator, it is not a fiduciary under the Act, and the fiduciary duty of care codified in § 404 is not activated.

516 U.S. 489, 527-28 (1996).  Moreover, "a company does not act in a fiduciary capacity when

deciding to amend or terminate a welfare benefits plan."     *Curtiss-Wright Corp. v.*

*Schoonejongen*, 514 U.S. 73, 78 (1995) (quoting *Adams v. Avondale Industries, Inc.*, 905 F.2d

943, 947 (6th Cir. 1990)).

CNC has moved to dismiss this count, arguing that when CNC withdrew from the Trust,

it acted as an employer, not a fiduciary.  *Def.'s Mot. to Dismiss* at 10 (Docket # 5) (*Def.'s First*

*Mot.*).   CNC contends that "an employer's decision to terminate an ERISA plan is a business

decision not a fiduciary function." *Def.'s First Mot.* at 14.   They further assert that the trustees,

not the Participating Employers, fit within the definition of fiduciary under the statute; CNC, as a

Participating Employer, is therefore not a fiduciary under § 1002.  CNC concedes that Ms. Parent

– an officer of its corporation – was a trustee and hence fiduciary of the Trust, but maintains that

she "did not participate in the Trust's decision-making concerning the response to CNC's

withdrawal, except at one meeting at which she appeared at the Trust's invitation." *Def.'s First*

*Mot.* at 13.   In addition, CNC claims that Ms. Parent was "firewalled" from the decision to withdraw, such that her duties as trustee were not tainted by this information.

The Court need not decide whether CNC was a fiduciary.   Assuming *arguendo* that CNC was a fiduciary, the next issue is exactly what CNC actions could constitute a breach of fiduciary duty.   The actual language of Count IV reveals that the Plaintiffs' only charge is that CNC withdrew from the Trust without paying the three months' premiums.   Certainly withdrawal from the Trust, with nothing more, is not a breach of any duty by either Ms. Parent or CNC; the Declaration of Trust itself provides a procedure for withdrawal by a Participating Employer.   *See* Declaration of Trust Art. 4, ¶ 4.5(a); *see also Curtiss-Wright Corp.*, 514 U.S. at 78 ("Employers or other plan sponsors are generally free under ERISA, for any reason at any time, to adopt, modify, or terminate welfare plans.").

Presumably recognizing that *Curtiss-Wright* is unhelpful to their position, the Plaintiffs do not quarrel with the proposition that CNC was not acting as a fiduciary when it  withdrew from the Trust.   Rather, they make the inventive argument that CNC violated its fiduciary obligations in the manner in which it withdrew, citing *Jackson v. Truck Drivers' Union Local 42 Health and Welfare Fund*, 933 F. Supp. 1124, 1143 (D. Mass. 1996) ("A distinction must be drawn, however, between the decision to terminate a plan and the manner in which that decision is implemented.").[15]   Unfortunately for the Plaintiffs, there is no language in the Declaration of

---

[15] In *Jackson*, a plan beneficiary who had sustained substantial medical bills sued the trustees of the fund for payment of his medical benefits under a terminated plan.   The trustees had made a collective decision to terminate the fund, but in such a fashion as to "cut off a group of the most vulnerable participants - - the ones who had been ill and previously filed claims." 933 F. Supp. 2d at 1144.   By favoring one group of beneficiaries over another, the court concluded that the trustees had violated a fiduciary duty of impartiality and that the plaintiff had "properly alleged a breach of the fiduciary duties of care and loyalty in the manner in which that decision was carried out." *Id.* at 1143-44.   The most obvious difference between *Jackson* and this case, however, is that the plaintiff in *Jackson* was a plan beneficiary and was suing for benefits to which he had been entitled under the plan.   Here, it is the Trust that is suing a Participating Employer for money it claims is owed as a result of the employer's withdrawal from the Trust.   Mixing the fiduciary duties a Trustee owes a plan beneficiary when terminating a plan with the legal duties a Participating Employer owes the Trust when exiting the Trust is mixing apples and oranges.

Trust or the Participation Agreement that prohibits CNC's phased withdrawal from participation. When establishing the Trust, the parties certainly could have included such a provision, but did not. Withdrawal from the Trust in accordance with its terms would not constitute a breach of fiduciary duty.

The Plaintiffs have another arrow in their quiver: they assert that CNC violated its fiduciary obligations by taking advantage of the dual roles Ms. Parent assumed as officer of CNC and trustee of the Bankers' Health Trust. Noting that for a Rule 12(b)(6) motion, the Court must both "accept as true the facts alleged in the complaint and draw all reasonable inferences in [plaintiff's] favor," *Toledo v. Sanchez*, 454 F.3d 24, 30 (1st Cir. 2006), Plaintiffs ask the Court to draw an inference from the allegations in the Complaint that, through her role as trustee, Ms. Parent discovered Pepperell's strategy for withdrawal, conveyed that knowledge to CNC, and that CNC used the knowledge as a roadmap for its withdrawal.

There are several problems with this theory. The Plaintiffs do not actually allege that Ms. Parent violated her fiduciary duty by revealing Pepperell's strategy to CNC; rather, they would have the Court infer that she did so based on the following allegation:

> In truth, Ms. Parent, as a Trustee, had gained detailed knowledge of how Pepperell Bank & Trust had attempted to evade its obligations to the Trust upon withdrawal – the very evasion Camden National sought to "follow" by its March 31 letter.

*Compl.* ¶ 49. The Plaintiffs' allegation amounts to a suspicion and they would have the Court draw an inference upon a suspicion. They suspect that because CNC took action consistent with Ms. Parent's detailed knowledge, she must have imparted the knowledge to CNC. They do not, however, come out and actually allege it; rather, they would have the Court infer what they

cannot in good faith assert.  But, in the circumstances of this case, if the Plaintiffs cannot in good faith allege it, the Court will not in good faith infer it.[16]

Moreover, during oral argument, the Plaintiffs conceded that the information about Pepperell's withdrawal strategy was a matter of public record.  As such, it is at least as reasonable an inference that CNC used public information in deciding how to withdraw as that it used confidential information.  Finally, if the Pepperell withdrawal information was a matter of public record, the Plaintiffs have cited no authority to support the proposition that Ms. Parent's revelation of otherwise public information would violate her fiduciary obligations.

Because Plaintiffs have not adequately stated a claim upon which relief may be granted, CNC's motion with respect to this count is granted.

### E.      Declaratory Judgment – Count VI

Finally, Plaintiffs have requested declaratory relief.   The Declaratory Judgment Act provides:

> In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. § 2201.  Whether to grant declaratory relief is in the discretion of the court: "The Act 'neither imposes an unflagging duty upon the courts to decide declaratory judgment actions nor grants an entitlement to litigants to demand declaratory remedies.'"   *Diaz-Fonseca v. Puerto*

---

[16] Ruling on a motion to dismiss, a court must "accept as true all the factual allegations in the complaint and construe all reasonable inferences in favor of the plaintiffs." *Alternative Energy, Inc.*, 267 F.3d at 33.  It is also true that prior to discovery, a party may not be in a position to make a good faith allegation and may only have grounds to suspect.  Here, however, in view of the fact the Plaintiffs acknowledged that the information was already public and they had no additional facts to support the inference that Ms. Parent violated her fiduciary duties, an inference that she did so does not seem reasonable.

*Rico*, 451 F.3d 13, 39 (1st Cir. 2006) (quoting *El Dia, Inc. v. Hernandez Colon*, 963 F.2d 488, 493 (1st Cir. 1992)).  As a result, "federal courts retain substantial discretion in deciding whether to grant declaratory relief."  *Id*. (quoting *Ernst & Young v. Depositors Econ. Protection Corp.*, 45 F.3d 530, 534 (1st Cir. 1995)).  However, "[t]he judgment in a suit for declaratory judgment must be responsive to the pleadings and issues presented[,] and . . . a judgment which goes beyond the issues presented constitutes an advisory opinion upon a hypothetical basis, which the court cannot give."  *Id*. at 42 (quoting *St. Paul Fire & Marine Ins. Co. v. Lawson Bros. Iron Works*, 428 F.2d 929, 931 (10th Cir. 1970)).

The key statutory language here is "actual controversy"; a declaratory judgment may not be used as a "medium for securing an advisory opinion in a controversy which has not arisen." *Coffman v. Breeze Corps.*, 323 U.S. 316, 324 (1945).  CNC argues that this count of the Complaint "derives entirely from the first [five] counts and thus must also be dismissed."  *Def.'s First Mot*. at 2.  This is correct.  Because the Court is dismissing the first five counts of the Plaintiffs' Complaint, there remains no actual controversy between the parties.

In addition, the Plaintiffs have staked their claim to the view that the effective termination date for CNC was June 30, 2006.  Whatever else may be said about this controversy, CNC did not give notice of termination effective June 30, 2006; rather, it gave notice effective June 30, 2007.   It remains speculative whether after June 30, 2007 the parties will present an actual controversy; however, to declare relief at this juncture would be to issue an advisory opinion.

## V.    Motion for Leave to Amend the Amended Complaint

Under the federal rules, a party may only amend its pleading once as a matter of course prior to the filing of a responsive pleading.  Fed. R. Civ. P. 15(a).  "Otherwise a party may

amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." *Id*. Should a court deny a motion to file an amended complaint, that decision is reviewed for abuse of discretion. *Glassman v. Computervision Corp.*, 90 F.3d 617, 622 (1st Cir. 1996) (citation omitted). Generally, an appellate court will not affirm such a denial "[u]nless there appears to be an adequate reason for the denial of leave to amend (e.g., undue delay, bad faith, dilatory motive, futility of amendment, prejudice) . . . ." *Id*.

"In the abstract, futility is fully sufficient to justify the denial of a motion to amend." *Hatch v. Dep't for Children*, 274 F.3d 12, 19 (1st Cir. 2001); *see also Correa-Martinez v. Arrillaga-Belendez*, 903 F.2d 49, 59 (1st Cir. 1990) ("Where an amendment would be futile or would serve no legitimate purpose, the district court should not needlessly prolong matters."). The First Circuit has defined "futility" to mean that "the complaint, as amended, would fail to state a claim upon which relief could be granted." *Glassman,* 90 F.3d at 623. Thus, there is no "practical difference" between a grant of a Rule 12(b)(6) motion to dismiss and a denial of a motion to amend based on futility. *Id*. Accordingly, "the accuracy of the 'futility' label is gauged by reference to the liberal criteria of Federal Rule of Civil Procedure 12(b)(6)." *Hatch*, 274 F.3d at 19; *see also Ballesteros v. Bangor Hydro-Electric Co.*, 463 F. Supp. 2d 97, 2006 U.S. Dist. LEXIS 86766, at *13 (D. Me. Nov. 30, 2006) ("A motion to amend a complaint is measured by the liberal criteria of Federal Rule of Civil Procedure 12(b)(6).").

Here, the Plaintiffs seek to amend their Complaint to bolster their ERISA civil enforcement count, and to specify the equitable relief that they are seeking. However, the Court has concluded that the Plaintiffs have not adequately stated a claim for relief under 29 U.S.C. § 1132, because Plaintiffs are seeking a legal remedy. Accordingly, Count V has been dismissed

above, pursuant to CNC's Rule 12(b)(6) motion.  If Plaintiffs could amend the Complaint to adequately state a claim for relief under § 1132, the motion would not be futile.  However, the proposed amendments do nothing to save the merits of the § 1132 claim; thus, to allow Plaintiffs to amend the count would be futile, and Plaintiffs' motion for leave to amend is denied.

**VI.   Conclusion**

The Court GRANTS Camden National Corporation's Motion to Dismiss the Complaint (Docket # 5) and Motion to Dismiss the Amended Complaint (Docket # 14) and DENIES Plaintiffs' Motion for Leave to Amend the Amended Complaint (Docket # 19).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 28th day of February, 2007